Erin Rose Ronstadt, SBN 028362
Clayton W. Richards, SBN 029054
OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745
(602) 761-4443 Fax
erin@oberpekas.com
clayton@oberpekas.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Vikki Owen, an unmarried woman, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| The Standard Insurance Company, an ERISA plan fiduciary, | |
| Defendant. | |

For her claims against the Standard Insurance Company ("The Standard"), Plaintiff

Vikki Owen ("Dr. Owen" or "Plaintiff") alleges as follows:

## PARTIES, VENUE, AND JURISDICTION

1.  This action arises under the Employee Retirement Income Security Act of 1974,

29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2.  Dr. Owen was a participant and beneficiary of the UnitedHealth Group Inc.

Group Benefits Plan (the "Plan") as an employee of UnitedHealth Group, Inc.

("UnitedHealth"), the Plan Sponsor.

3.  Dr. Owen is an unmarried woman who resides in Maricopa County, Arizona.

4.  Dr. Owen resided in Maricopa County at all times since the effective date of The

Standard insurance policy, Number 643980-B ("the LTD Policy").

5.  The UnitedHealth Group Employee Benefits Plans Administrative Committee

(the "Committee") is the Plan Administrator and a plan fiduciary.

6.  The Standard is an insurance company licensed and authorized to do business in

Arizona.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

7.      The Standard is domiciled and incorporated in the State of Oregon.

8.      The Standard has intentionally availed itself of the benefits and protections of the laws of the State of Arizona.

9.      The Standard or its subsidiaries operate within Arizona for the purposes of maintaining and administering disability insurance policies.

10.     The Standard operates insurance sales offices in Arizona, including but not limited to the sale of disability policies.

11.     The Standard is a third-party claims administrator for the Plan and is a plan fiduciary.

12.     The LTD Policy issued by The Standard states that, "[e]xcept for those functions which the Group Policy specifically reserves to the Policyholder or Employer, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."

13.     The LTD Policy states The Standard's authority includes, "1. [t]he right to resolve all matters when a review has been requested"; 2. [t]he right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it"; 3. [t]he right to determine (a) eligibility for insurance; (b) entitlement to benefits; (c) [t]he amount of benefits payable; and (d) [t]he sufficiency and the amount of information we may reasonably require to determine a., b., or c., above."

14.     The LTD Policy asserts that, "[s]ubject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding."

15.     The Standard has a duty to administer the Plan prudently and in the best interests of all Plan participants and beneficiaries.

16.     The Plan and UnitedHealth have their principal place of business in the state of Minnesota.

17.     This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

18.     Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### Plan Language

19.     United Health's Summary Plan Description ("SPD") defines Disability as follows:

> ➤ During the LTD Waiting Period and during the first 24-month period when you receive benefits under the LTD Program: You are Disabled if, as a result of a Medical Condition, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation, and as a result you are unable to earn at least 80% of your Predisability Earnings as adjusted for inflation when working in your Own Occupation.

> ➤ "Your Own Occupation" means any employment, business, trade, profession, calling or vocation that involves the Material Duties of the same general character as the occupation you are regularly performing for the Company when your Disability begins. In determining your Own Occupation, the Claims Administrator is not limited to looking at the way you perform your job for the Company, but it may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

> ➤ "Material Duties" means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will the Claims Administrator consider working an average of more than 40 hours per week to be a Material Duty.

> ➤ After the first 24-month period during which you receive benefits under the LTD Program: You are Disabled if, as a result of a Medical Condition, you are unable to perform with reasonable continuity the Material Duties of Any Occupation, and as a result you are unable to earn at least 60% of your Predisability Earnings as adjusted for inflation.

> ➤ "Any Occupation" means any occupation or employment that you are able to perform, whether due to education, training or experience, and that is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Predisability Earnings adjusted for inflation, within 12 months following your return to work, regardless of whether you are working in that or any other occupation.

20.     The SPD defines "Medical Condition" as "Illness, Physical Disease, Injury, pregnancy and/or Mental Disorder and Substance Use Disorder or Dependence."

21.     The SPD defines "Medical Evidence" as:

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

➢ Clear documentation, provided by the Physician supporting your Disability, of functional impairments and functional limitations due to a Medically Determinable Impairment that would prevent you from performing the Material Duties of your Own Occupation (for STD Benefits and initial 24 months of LTD Benefits) or Any Occupation (after the initial 24 months of LTD Benefits) safely and/or adequately.

22.    The Standard's Certificate of Insurance defines Disability slightly differently as follows:

➢ Own Occupation Definition Of Disability

During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1. You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and

2. You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

➢ Any Occupation Definition Of Disability

During the Any Occupation Period you are required to be Disabled from all occupations.

You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.

Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

23.    The Standard's Certificate of Insurance does not define "Medical Condition" or "Medical Evidence."

24.    The Standard's Certificate of Insurance defines "Predisability Earnings" as follows:

➢ Your Predisability Earnings will be based on your base pay in effect on your last full day of Active Work. Any subsequent change in your base pay received after that last full day of Active Work will not affect your Predisability Earnings.

Predisability Earnings means your monthly rate of earnings from your Participating Employer, including:

1. Contributions you make through a salary reduction agreement with your Participating Employer to:

   a) An Internal Revenue Code (IRC) Section 401(k), 403(b), 408(k), 408(p), or 457 deferred compensation arrangement; or
   b) An executive nonqualified deferred compensation arrangement.

2. Commissions and incentive compensation you receive from the Rewarding Results Program and Quarterly Variable Compensation program averaged over the 24 months ending on August 31 of the calendar year that precedes the calendar year of your last full day of Active Work. If you received incentive compensation in only one of the two years preceding August 31 of the calendar year that precedes the calendar year of your last full day of Active Work, the monthly average of your incentive compensation for that year will be included in calculation of your monthly rate of earnings.

3. Amounts contributed to your welfare and/or fringe benefits according to a salary reduction agreement under an IRC Section 125 plan.

4. Shift differential pay received over the 12 months ending on August 31 of the calendar year that precedes the calendar year of your last full day of Active Work or over the period of your employment if you have been employed for less than 12 months on August 31 of the preceding year.

Predisability Earnings does not include:

1. Bonuses and other forms of incentive compensation not listed above.
2. Awards.
3. Overtime pay.
4. Your Participating Employer's contribution on your behalf to any employee welfare or pension benefit plan.
5. Any other extra form of compensation or fringe benefits.

If you are paid on an annual salary basis, your monthly rate of earnings is one-twelfth (1/12th) of your annual salary.

If you are paid hourly, your monthly rate of earnings is based on your hourly pay rate multiplied by your standard hours, but not more than 173.33 hours.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

### Dr. Owen's Employment

25.    Dr. Owen is a licensed D.O. physician Board Certified in Family Practice.

26.    Dr. Owen worked as a "Physician Advisor – 2" with UnitedHealth Group from January 3, 2011 until her last date of work on October 18, 2016.

27.    Dr. Owen had been working from home 40 hours per week at the time she became disabled.

28.    Dr. Owen's base salary was $142,016.12 annually, or $11,834.68 monthly.

29.    On information and belief, in addition to her base salary, Dr. Owen made contributions to her welfare and/or fringe benefits, received commissions and incentive compensation from the Rewarding Results Program and Quarterly Variable Compensation program, and was paid a shift differential.

30.    Under the LTD Plan, from April 20, 2017 to April 20, 2019, Dr. Owen is Disabled if she meets the Own Occupation definition of Disability.

### Dr. Owen's Disability

31.    Dr. Owen suffers from left hip osteoarthritis and lumbar spine degenerative disc disease.

32.    Dr. Owen has a history of chronic low back pain with intermittent radicular pain to her right leg; however, in the months preceding her last date of work, Dr. Owen's low back and leg pain became progressively more severe.

33.    Dr. Owen had tried physical therapy and epidural injections in the past; however, these did not yield any long-term benefits for her.

34.    In late 2016, Dr. Owen began having difficulty walking any significant distance, and her pain was interfering with her ability to perform the Material Duties of her Own Occupation and activities of daily living.

35.    While Dr. Owen had previously been able to subdue the pain and other symptomology with conservative treatment, both conditions (back and hip) had reached a severity necessitating surgical intervention.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

36.    Due to the severity of her degenerative disc disease at the L5-S1 level coupled with her exhaustion of conservative treatment, Dr. Owen's treating spine surgeon, Dr. Oner Khera, recommended surgery.

37.    Dr. Owen's October 27, 2016 pre-surgical lumbar CT scan and bending x-ray views revealed a "severe disc desiccation with vacuum disc associated with the grade 2 anterolisthesis of L5 on S1" and "severe stenosis of the neural foramina between the bulging disc and pedicles with probable compression of the exiting L5 nerve roots bilaterally."

38.    Dr. Khera, who specializes in orthopedic spine care, explained, "[t]his is essentially bone on bone with end plate degenerative [sic] at L5-S1."

39.    After reviewing this additional imaging, Dr. Khera recommended foregoing the original plan for placement of an interbody cage.

40.    Dr. Khera further explained:

➢ The main goals of any surgery were to decompress Dr. Owen's nerves and fuse the L5-S1 segment.

➢ There was such significant collapse of the L5-S1 disc that the disc space preparation may violate end plates and therefore place the cage at higher risk for subsidence.

➢ Dr. Owen has a grade 2 spondylolisthesis, and therefore there would be a possible risk of neurological demise with new weakness or pain or numbness and tingling as a result of an aggressive reduction maneuver intraoperatively.

➢ She will be left with some aspect of back and leg pain chronically.

➢ The surgery is not designed to cure her.

41.    With respect to Dr. Owen's longstanding osteoarthritis in her left hip which caused significant pain, she underwent various conservative treatments, such as intra-articular cortisone injections, non-steroidal anti-inflammatory medications ("NSAIDs"), and chiropractic treatment, before electing to undergo surgery.

42.    On November 1, 2016, Dr. Owen underwent a left hip arthroplasty by Dr. Vishal Genesh.

43. Post-surgery, Dr. Owen underwent in-home physical therapy from November 3, 2016 to November 11, 2016.

44. On December 17, 2016, Dr. Owen underwent a L5-S1 instrumented fusion and laminectomy.

45. Post-operatively, Dr. Owen experienced significant radiating pain to her right leg.

46. A post-surgical CT scan revealed a possible medial screw breech at S1 on the right side causing the right leg pain.

47. Therefore, on December 19, 2016, Dr. Owen underwent a revision surgery with removal and replacement of hardware at L5-S1, as well as revision decompressions of the right-sided foraminal and lateral recess.

48. Unfortunately, the surgeries did not resolve her right leg radiating pain. In fact, the pain was worse than it was pre-surgery.

49. Dr. Owen ceased working to undergo surgery with the intension of returning to work after she recovered.

50. Dr. Owen, however, never recovered from her lumbar spine surgery.

51. Dr. Khera offered further surgical intervention with the following precautions:

➢ "[It] may or may not help with her leg pain;"

➢ "[He] would like to do this in steps as there may be a potential in the future that she might need an anterior lumbar interbody fusion, be it for possible further foraminal decompression indirectly or for further stabilization and surface area for potential fusion;"

➢ "[T]here may be some possible excursion issues with the nerve;"

➢ "This may be continued irritation of the nerve from just general inflammation and trauma from surgery;"

➢ "She understands that she may need further surgery down the road;" and

➢ "She understands that this leg pain may never improve, and she may be left with this permanently."

52. To that end, Dr. Owen underwent her third lumbar spine surgery on January 14, 2017 to remove the right-sided pedicle screws and rod from L5-S1.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

53.     Unfortunately, the third surgery was not successful. Dr. Owen continues to experience severe right leg radiating pain and weakness, as well as chronic low back discomfort and stiffness.

54.     Dr. Owen's ongoing symptomology is objectively substantiated.

55.     Physical examinations after her third surgery reveal objective findings of tenderness in the lumbar facet and sacroiliac joints, diminished sensation to her right lateral leg and dorsum of her foot, give-away/decreased strength in her right leg, positive right straight leg raise, positive right foot drop, decreased right patella and Achilles reflexes, and/or an antalgic gait.

56.     Dr. Owen's physical examination findings are consistent with her May 4, 2017 EMG, which reveals ongoing right L4-5 and L5-S1 radiculopathy.

57.     Her findings are also consistent with her December 26, 2017 lumbar spine MRI, which revealed a 15-mm anterolisthesis of L5 on S1 and severe foraminal stenosis bilaterally.

58.     On August 9, 2017, Dr. Khera noted that Dr. Owen had "plateaued" in her recovery and referred her to a pain management doctor, concluding that, "[t]his may be something that she may always be left with as far as chronic pain."

59.     Dr. Owen initiated pain management treatment with Dr. Jonathan Carlson on December 19, 2017; however, due to differences in opinion regarding treatment, Dr. Owen terminated this doctor-patient relationship on March 15, 2018.

60.     Dr. Owen began treatment with a new pain management physician, Dr. Minesh, Zaveri on June 27, 2018.

61.     Regarding ongoing treatment, Dr. Owen has tried several pain medications, including Lyrica, Gabapentin, Oxycodone, and Motrin 800 mg, with minimal relief.

62.     Dr. Owen also underwent right L4, L5, and S1 transforaminal epidural steroid injections on July 17, 2018.

63.     Unfortunately, she temporarily felt worse after the injections and did not receive any benefit from them.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

64.     She receives chiropractic treatment approximately twice weekly.

65.     More recently, Dr. Zaveri recommended a spinal stimulator.

66.     On June 29, 2018, Dr. Owen underwent the required psychological evaluation to address the appropriateness of the spinal stimulator, and she was deemed an appropriate candidate.

67.     Despite treatment, including multiple surgeries, Dr. Owen continues to experience lumbar spine pain with severe radicular pain to her right lower extremity, as well as occasional left hip pain. The medical evidence indisputably supports ongoing Disability.

68.     Due to her medical conditions, Dr. Owen is incapable of performing the duties of her Own Occupation or Any Occupation. The medical records and Dr. Owen's credible symptomology substantiate her Disability. Dr. Owen's inability to work is further evidenced by her treating provider assessments:

➢  In a March 31, 2017 *Concurrent Disability and Leave Statement of Incapacity/Attending Physician Statement* form, Dr. Khera concluded that Dr. Owen is unable to perform her job functions due to her medical condition. Dr. Khera explained that Dr. Owen cannot sit or stand for more than 30 minutes at a time due to chronic nerve pain.

➢  In a letter dated April 25, 2017, Dr. Khera clarified that, "[Dr. Owen] continues to deal with notable discomfort and symptoms involving pain, numbness and tingling involving her right lower extremity since the surgery. She has had multiple back surgeries in just the last few months. I continue to watch her closely. Until then she is to remain off work until further notice."

➢  In a letter dated March 15, 2018, Dr. Khera explained: Dr. Owen continues to deal with dysesthesias and radicular symptoms in her right leg; has continued chronic back pain despite surgeries; has not benefitted from the surgeries or treatments; has weakness in her ankle; must shift positions continuously and alter her activities daily; requires oxycodone and Lyrica, which do not relieve all of her pain; has limited ability to walk, stand, or sit for prolonged periods; must lean on walls for supports at times; and her ability to concentrate is affected. Dr. Owen has not made any major improvement in her symptoms, they are likely to be permanent, and will prevent her from working. At best, Dr. Owen may be able to work one hour at a time followed by a one-hour break for only 5 to 10 hours a week. Dr. Owen's pain is likely to permanently impair her ability to work.

➢  In a letter dated July 31, 2018, Dr. Khera noted that, "[Dr. Owen] is not better than where she was when I last visited with her just a few months back. With that in mind, I would continue to make the same recommendations and I would have the continued very modest expectations for an improvement for her moving forward, as I detailed in my earlier letter from March of 2018."

-10-

69.    Dr. Owen's treating providers are best situated to assess her functionality, especially Dr. Khera, her spinal surgeon.

70.    Dr. Khera's conclusions are objectively substantiated by the medical evidence and based on a longstanding treatment history with Dr. Owen.

71.    A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability v. Nord*, 538 U.S. 822, 834 (2003).

### *Vocational Analysis*

72.    In an effort to better understand Dr. Owen's vocational capabilities, Dr. Owen sought the opinion of a vocational expert who conducted a vocational evaluation on August 1, 2018.

73.    The evaluation included an in-person interview and a review of the file.

74.    In his report dated August 2, 2018, the vocational expert concluded that, "Ms. Vikki Owen is competitively unemployable in any capacity related to her past relevant work or, for that matter, any job for which she would have transferable skills. In fact, she does not appear to have any ability to work in any capacity based on the treating provider's information."

75.    The vocational expert explains that, "Dr. Khera is very familiar with Dr. Owen's situation as he performed three of her four surgeries," and "*Dr. Khera's restrictions as noted in her 3/15/18 [letter] are work preclusive from a vocational standpoint.*"

76.    The vocational expert further explains:

> Dr. Owen has an excellent work history. She was accustomed to making significant wages and, in fact, was also motivated to take on a second job one day per week which added an additional $60,000.00 to her annual salary. Her work ethic is outstanding. It is the opinion of this Consultant that if she could work, she would continue to do so as she was accustomed to making over $200,000.00 annually. Her past work ethic makes her a very credible individual. She readily admits to having a "love for the perfect job" as she describes her past work with United Health Group. She was able to sit or stand as needed when trying to complete 2-3 files per hour at home however, she was unable to maintain quality and production when doing this highly skilled job.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

*Dr. Owen's LTD Benefits*

77.    The Standard began paying LTD benefits to Dr. Owen effective April 20, 2017.

78.    The Standard did not correctly calculate Dr. Owen's Pre-disability Earnings because The Standard did not include contributions to her welfare and/or fringe benefits, commissions and incentive compensation received from the Rewarding Results Program and Quarterly Variable Compensation program, or her shift differential pay.

79.    In an email dated April 12, 2017 the Committee erroneously informed The Standard that Dr. Owen did not receive incentive compensation for the period of September 1, 2014 through August 31, 2016.

80.    The Standard did not inquire about Dr. Owen's contributions to her welfare and/or fringe benefits, commissions, or her shift differential pay from the Committee.

81.    The Standard knew, or should have known, that Dr. Owen received Pre-disability Earnings beyond her base pay. In part, this is because the Committee provided The Standard with Dr. Owen's September 23, 2016 paycheck information, which clearly notes additional earnings beyond her base pay.

82.    Collectively, the Defendants failed to properly investigate and communicate Dr. Owen's Pre-disability Earnings, which resulted in an underpayment of LTD benefits from April 20, 2017 through December 16, 2017.

83.    In a letter dated February 15, 2018, The Standard terminated Dr. Owen's LTD benefits (the "Denial").

84.    The Standard asserted Dr. Owen no longer met the Own Occupation definition of disability in the Policy as of December 16, 2017.

85.    The Standard largely based the Denial on a flawed file review by its paid consultant—Dr. Richard Semble. In his January 25, 2018 report, Dr. Semble made multiple errors and misrepresentations as follows:

> ➢ Dr. Semble failed to address or acknowledge Dr. Owen's January 14, 2017 lumbar spine surgery. It is unclear whether Dr. Semble overlooked this pertinent information, or if the Standard failed to provide it to him. Either way, this is a vital piece of medical evidence that should have been considered.

-12-

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

➢ Dr. Semble failed to address or acknowledge the multiple ongoing complaints and objective findings after Dr. Owen's December 2016 lumbar spine surgeries noting ongoing issues – findings significant enough to necessitate a third surgery.

➢ Dr. Semble regularly downplayed or ignored significant examination findings in his review of the medical records. For example, in his summary of Dr. Khera's November 28, 2017 office visit note, Dr. Semble notes "strength was stable from last visit, was walking without an assistive device." However, Dr. Khera also observed an antalgic gait, noted ongoing radicular symptomology in the right lower extremity, and weak right ankle dorsiflexion and plantarflexion (i.e. "stable" strength from previous exam).

➢ Similarly, Dr. Semble failed to note pertinent physical examination findings in his summaries of Dr. Owen's office visits with Dr. Khera on April 6, 2017 and neurologist Dr. Naveed Vehra on April 17, 2017.

➢ Dr. Semble failed to address the significance of Dr. Owen's diagnostic findings, such as Dr. Owen's ongoing "severe foraminal stenosis" noted in her December 26, 2017 lumbar spine MRI – a significant objective finding that Dr. Semble conveniently failed to mention or consider in his "review" of the MRI report.

➢ Additionally, Dr. Semble failed to provide any meaningful analysis explaining the rationale behind his restrictions and limitations and to assess the impact Dr. Owen's pain and medication side effects have on her cognitive abilities and stamina (*i.e.* her non-exertional limitations).

➢ Dr. Semble has never physically examined or even spoken with Dr. Owen or her treating providers. His opinion is based solely on a review of the medical records.

86.     Yet, Dr. Semble disagreed with the opinions of Dr. Owen's treating specialists and her credible symptomology.

87.     In the Denial, the Standard failed to explain why it credited its medical file reviewer over Dr. Owen's treating providers.

88.     The Standard unreasonably relied on Dr. Semble's opinion when it knew or should have known that he conducted an inadequate and biased review.

89.     Because The Standard's February 8, 2018 vocational analysis was entirely based on the restrictions and limitations outlined by Dr. Semble, that vocational analysis is flawed and should be disregarded.

90.     On August 14, 2018, Dr. Owen appealed the Denial (the "Appeal").

91.     The Standard delayed rendering a decision on Dr. Owen's appeal in violation of ERISA regulations.

92.     On October 5, 2018, The Standard denied the Appeal (the "Final Denial").

93.   As part of its review, and in violation of ERISA regulations, The Standard gathered new evidence to support the Denial and did not provide Dr. Owen opportunity to respond to the new evidence.

94.   The Final Denial does not fully explain The Standard's rejection of the opinions of Dr. Owen's treating physicians.

95.   The Final Denial does not address all of the additional medical evidence submitted with the Appeal, stating only "[w]e considered the additional information submitted during the appeal, as well as the statements provided by [Dr. Owen] and her treatment providers."

96.   The Final Denial does not cite any specific medical evidence from Dr. Owen's claim file to support its conclusion she is not Disabled.

97.   The Medical Review in the Final Denial cherry-picked evidence to support the Denial.

98.   That the Final Denial was not an independent review of Dr. Owen's claim, as required by ERISA regulations, is evidenced by the Final Denial's incorporating by reference parts of the initial Denial.

99.   The Final Denial asserts, "[Dr. Owen] is entitled to one independent review of the decision to close her claim under the terms of the UnitedHealth Group Policy. [The Standard has] completed that review and will not be able to provide LTD benefits to [Dr. Owen."

100.   The Final Denial states, "This concludes the administrative review process by the Administrative Review Unit."

101.   The Final Denial notes Dr. Owen's right to file suit under Section 502(a) of ERISA.

102.   Dr. Owen cannot perform the material duties of her Regular Occupation or Any Occupation and therefore comes within the definition of Disability under the Plan.

103.   Dr. Owen exhausted her administrative remedies and timely filed this lawsuit.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

# COUNT I
### *(Recovery of LTD Plan Benefits)*

104.    All other paragraphs are incorporated by reference.

105.    The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

106.    The Plan represents LTD coverage and a promise to provide LTD benefits until Dr. Owen is no longer Disabled under the terms of the Plan.

107.    Dr. Owen continues to be Disabled from her Own Occupation or Any Occupation.

108.    Dr. Owen has claimed the benefits under the Plan to which she is entitled.

109.    Dr. Owen reasonably expected that her medical conditions met the requirements of Disability as defined by the Plan and that she would receive benefits under the Plan until she reaches her Social Security Normal Retirement Age, or until she was no longer Disabled.

110.    Despite the coverage of Dr. Owen's Disability, The Standard improperly terminated her LTD benefits in breach of the Plan and ERISA.

111.    The Standard's conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

112.    On information and belief, the Committee did not properly delegate its discretionary authority to The Standard.

113.    Even if the Committee properly delegated discretionary authority to The Standard, in light of The Standard's wholesale and flagrant procedural violations of ERISA, Dr. Owen's claim should be entitled to de novo review. *See Halo v. Yale Health Plan*, 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed de novo in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to

comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

114.    Instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Dr. Owen is informed and believes that The Standard makes claims decisions based on the claims resources and financial risk it faces on certain claims.

115.    The Standard wrongfully denied Dr. Owen's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

116.    For the period of time The Standard paid benefits, it underpaid benefits from April 20, 2017 to December 16, 2017 because it relied on an erroneous calculation of Dr. Owen's Pre-disability Earnings that did not include contributions to her welfare and/or fringe benefits, commissions and incentive compensation received from the Rewarding Results Program and Quarterly Variable Compensation program, or her shift differential pay.

117.    The Standard did not properly consider all of the available evidence when terminating Dr. Owen's benefits.

118.    The Standard failed to conduct a full and fair review.

119.    The Standard misstated medical evidence for its own financial benefit, *e.g.*, it excessively relied on biased medical reviews provided by in-house medical consultants.

120.    The Standard relied on findings that constitute "clearly erroneous findings of fact" to deny Dr. Owen's benefits.

121.    The Standard abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, The Standard ignored the inaccuracies or created new reasons for the denial of benefits.

122.    The Standard's claims review process is designed to pay LTD benefits for the least amount of time possible.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

123.   The Standard's approved LTD claims are matched to one of three Disability Management tracks: Expected to Recover, Disabled with Minimal Chance of Recovery, and Return to Work Assistance Needed.

124.   The "Expected to Recover" track relies on the Medical Disability Advisor "MDA" to limit the duration of a claim and The Standard's liability.

125.   By design, the MDA is an insurance industry reference that favors non-payment of claims.

126.   The MDA is published by the Reed Group—a consulting firm specializing in "leave management solutions."

127.   The MDA defines minimum disability durations and views any disability lasting longer than the minimum disability duration to be "medically discretionary," *i.e.,* terminating benefits at the end of the minimum disability duration is deemed a "defensible decision," per the MDA.

128.   The Forward of the Fifth Edition of the MDA includes:

> Increasingly, employers recognize the connection between healthy workers and company productivity. The health and productivity connection is reflected in employer concerns about the impact of absenteeism on worker productivity, company morale, and customer satisfaction as well as costs of benefits, replacement workers, recruitment, and training. One manifestation of this new awareness is employer focus on minimizing disability and encouraging appropriate return to work behaviors through disability management programs. . . .
>
> . . .
>
> To have effective partnerships around disability management and return to work goals, there must be tools that assist employers, providers, and other participants in the disability management process to be successful in their efforts to minimize disability impact on the workplace. These tools must incorporate current quality standards, be clear and easy to-use and reliable. The disability duration guidelines provided in The Medical Disability Advisor are an excellent example of such tools. These guidelines help assure a consistent approach to determining disability duration for purposes of benefits decisions. These guidelines provide a starting point from which to build a disability management program that incorporates job requirements and individual functional abilities
>
> The Medical Disability Advisor has been used by . . . managed care companies, insurance carriers, physicians, disability determination companies, and third party administrators . . . This effort makes an important contribution by providing a common basis for various

-17-

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

stakeholders in the disability management process to discuss disability duration assessments as one component of a disability management program

129.   The express purpose of the MDA is to be a tool to minimize payment of LTD benefits.

130.   To the extent The Standard relied on the MDA in terminating Dr. Owen's LTD benefits, the portions of the MDA should have been provided to Dr. Owen because they are relevant documents as defined by the claims procedure regulation, 29 C.F.R. 256.503-1(m)(8).

131.   On information and belief, the focus of the "Return to Work Assistance Needed" track at The Standard is to terminate benefit payments and limit The Standard's liability by identifying other potential occupations for the disabled employee.

132.   On information and belief, the focus of the "Disabled with Minimal Chance of Recovery" track is to find other sources of income to reduce The Standard's liability.

133.   The Standard works with its clients' human resource departments to reduce The Standard's liability for LTD benefits and employers' disability-related costs by, for example, accommodating disabilities or assigning employees to different jobs before they stop working.

134.   The Standard monitors overall claim administration compliance through its Supervisors, senior team member oversight, audits, and claim system diary events.

135.   Benefit Examiners and Analysts have weekly "rounds" at which they can discuss questionable claims or issues.

136.   The Standard evaluates its employees based on monthly procedural and quality audits.

137.   Quality related statistics are a component of each employee's annual performance appraisal.

138.   The Standard used biased personnel and medical reviewers, who placed its interests ahead of Dr. Owen's interests.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

139.   On information and belief, The Standard tainted its medical file reviewers by giving the reviewers inaccurate information regarding Dr. Owen, while also failing to provide its reviewers with all of the relevant evidence.

140.   On information and belief, The Standard provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

141.   On information and belief, The Standard did nothing to insulate the appeals reviews from its initial determination and used the same claims managers throughout Dr. Owen's administrative appeals process, or at least used employees who were managed by the same person(s) and who were orchestrating the denial according to Claim Discussion directives. See 29 C.F.R. 2560.503-1(h)(3)(ii), (h)(4) (requires claim fiduciaries to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.").

142.   The Standard routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

143.   The Standard's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrate its abuse of discretion and improper claims handling.

144.   The Standard failed to properly consider the opinions of Dr. Owen's treating and examining physicians.

145.   In terminating Dr. Owen's LTD benefits, The Standard completely disregarded evidence that Dr. Owen's conditions had not improved and had, in fact, worsened.

146.   The Standard has no evidence that Dr. Owen's conditions changed or improved since it determined that she met the definition of Disabled in the Policy.

147.   On information and belief, The Standard used in-house reviewers in evaluating Dr. Owen's claim, because it knew that the in-house reviewers' recommendations would be unfavorable for the continuation of Dr. Owen's benefits.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

148. The Standard's peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

149. None of The Standard's reviewing physicians ever set forth any substantive reasons why Dr. Owen's treating doctors' opinions were incorrect.

150. The Standard failed to explain why it credited the physician reviewers over Dr. Owen's treating physicians.

151. The peer reviewers were not given the Plan or other important records for reaching their decision that Dr. Owen could perform work.

152. The Standard engaged in other procedural irregularities, which it did to serve its own financial best interests.

153. On information and belief, The Standard engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

154. The Standard intentionally gathered evidence to support a decision to terminate Dr. Owen's LTD benefits.

155. Dr. Owen alleges upon information and belief that The Standard has a parsimonious claims handling history.

156. The Standard failed to conduct a "meaningful dialogue" regarding Dr. Owen's claim.

157. Under the de novo standard of review, to be entitled to benefits, Dr. Owen need only prove by a preponderance of the evidence that she is disabled.

158. Even under the abuse of discretion standard of review, The Standard abused its discretion because its decision terminating Dr. Owen's disability benefits was arbitrary and capricious and caused or influenced by The Standard's, its reviewing physicians', and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

159. Dr. Owen is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process

-20-

and also regarding the effects of The Standard's reviewing physicians', its employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Dr. Owen's LTD claim.

160. Under the de novo standard of review, Dr. Owen is entitled to discovery regarding, among other things, the credibility of The Standard's medical reviews and The Standard's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

161. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Dr. Owen is entitled to recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

162. Dr. Owen is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of her disability benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

163. Pursuant to 29 U.S.C. § 1132(g), Dr. Owen is entitled to recover her attorneys' fees and costs incurred herein.

**COUNT II**
**(Breach of Fiduciary Duty)**

164. All other paragraphs are incorporated by reference.

165. Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

166. The Standard is a fiduciary and owes fiduciary duties to Plan participants, including Dr. Owen.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-21-

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

167.    Under 29 U.S.C. § 1104(a), The Standard is required to discharge its duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

168.    Under ERISA, which is founded in trust principles, The Standard is required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

169.    In multiple ways throughout the administration of Dr. Owen's claim, The Standard breached its fiduciary duty pursuant to 29 U.S.C. § 1132(a)(3).

170.    The Standard breached its fiduciary duty by failing to investigate Dr. Owen's PreDisability Earnings, which resulted in an underpayment of benefits.

171.    The Standard's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty because The Standard's claims handling was discharged imprudently and caused Dr. Owen serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

172.    To the extent The Standard's denial of benefits caused Dr. Owen harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

173.    On information and belief, The Standard instructs and/or incentivizes certain employee(s) to terminate fully-insured LTD claims and appeals based on bias or its financial interests.

174.    Dr. Owen is informed and believes that The Standard's employees are trained in administering claims in the best interests of The Standard, not Plan participants.

175.    The Standard demonstrated bias and malice against Dr. Owen through its employees. Instead of fully and fairly reviewing the medical evidence, The Standard unreasonably denied Dr. Owen's claim based on unreliable evidence.

176.    The Standard's failure to act prudently and in the best interests of Dr. Owen is a breach of fiduciary duty requiring appropriate equitable relief following discovery of The Standard's conduct as it relates to Dr. Owen's claim.

177.    Dr. Owen is informed and believes that The Standard has targeted claims under the Plan, including Dr. Owen's, which is a breach of fiduciary duty.

178.    On information and belief, The Standard breached its fiduciary duty to Dr. Owen by terminating her claim in an effort to avoid its financial liability.

179.    Based on the facts of this case, Dr. Owen has "other equitable relief" available to her in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Dr. Owen whole for her losses from The Standard's breaching conduct.

180.    Resulting from the improper termination of her LTD benefits, Dr. Owen had to cash out her employee stock and, as a result, has a significant tax liability she cannot afford to pay.

181.    Dr. Owen has taken out personal loans.

182.    Dr. Owen has "maxed out" her credit cards in order to meet her basic needs.

183.    Prejudgment interest is properly awarded as a surcharge for breach of fiduciary duty.

184.    Prejudgment interest is a measure of a plaintiff's loss. *City of Milwaukee v. Cement Div. Nat. Gypsum Co.,* 515 U.S. 189, 195 (1995).

185.    Losses incurred by a beneficiary caused by denial of benefits are not recoverable under 29 U.S.C. § 1132(a)(1)(B), which only allows for recovery of benefits due; enforcement of rights under the terms of a plan; or clarification of rights to future benefits. ERISA does not specifically authorize an award of prejudgment interest on wrongfully denied benefits. *Dishman v. UNUM Life Ins. Co. of Am.,* 269 F.3d 974, 988 (9th Cir. 2001); *In Re Broadus,* 516 F.R. 378, 395 (S.D. Miss. 2014) (looking to state law for pre-judgment

---

[1] *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011). "Surcharge" is a remedy for breach of fiduciary duty. *Id.* at 444 ("a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm"). A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

interest where ERISA is silent on issue) (citing *Hansen v. Cont'l Ins. Co.,* 940 F.2d 91, 984-85 (5th Cir. 1991) *abrogated on other grounds, Koelher v. Aetna Health Inc.,* 683 F.3d 182 (5th Cir. 2012).

186.   Plaintiffs are entitled to discovery, under 29 U.S.C. § 1132(a)(3), on their right to prejudgment interest and the appropriate interest rate. The Court has broad discretion to fashion appropriate relief to make Dr. Owen whole and should mold the relief necessary to protect the rights of the participants.

187.   Dr. Owen is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

188.   Dr. Own is entitled to enjoin any act or practice by The Standard that violates ERISA or the Plan or seek other appropriate equitable relief that is traditionally available in equity.

189.   The Standard was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Dr. Owen's benefits for its own profit.

190.   The Standard engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, which is conduct the Court can enjoin.

191.   The Standard acted with malice and in bad faith against Dr. Owen, which constitutes a violation of its fiduciary obligations.

192.   ERISA "does not elsewhere adequately remedy" the injuries caused to Dr. Owen by The Standard's breach of fiduciary duty violation.

193.   As a direct and proximate result of The Standard's breach of fiduciary duty, Dr. Owen suffered actual, significant financial harm and has incurred financial expense.

194.   Pursuant to 29 U.S.C. § 1132(g), Dr. Owen is entitled to recover her attorneys' fees and costs incurred herein.

**WHEREFORE**, on all claims, Dr. Owen prays for entry of judgment against The Standard as set forth in this Complaint, which includes:

A.  All past LTD benefits under the terms of the Plan, including underpayments;

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-24-

B.  Clarifying and determining Dr. Owen's rights to future benefits under the terms of the Plan;

C.  For any other benefits Dr. Owen may be entitled to receive under the Plan due to her disability;

D.  All other equitable relief that is proper as a result of The Standard's breach of fiduciary duty, including but not limited to surcharge and prejudgment interest;

E.  An award of Dr. Owen's attorneys' fees and costs incurred herein; and

F.  For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 5th day of April 2019.

OBER PEKAS RONSTADT

By:_____*s/ Erin Rose Ronstadt*_____
　　　Erin Rose Ronstadt
　　　Clayton W. Richards
　　　Attorneys for Plaintiff

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-25-